Good morning, Your Honor. I am Judge Michael Brennan. I am on Zoom here with Judge Kenneth Ripple and Judge Amy St. Eve. Myself and Judge St. Eve are here in Chicago. Judge Ripple is in South Bend. I want to begin with a brief apology to Mr. Gershengord and Ms. Koberle to not have given you more time to let you know that you have more time. So, we will be proceeding with 20 minutes per side. And Mr. Gershengord, you have reserved a certain amount of time, three minutes for rebuttal. Is that correct? That's correct, Your Honor. Very good. We'll begin then with case number 119-3129, Wisconsin Central LTD v. Soo Line Railroad Company. Mr. Gershengord, we'll begin with you. Good morning, Your Honors, and may it please the Court. My client, WCL, is the buyer in a dispute about whether the buyer or the seller bears responsibility under a sales contract for money two railroads paid to settle environmental litigation at Crayer Park in Wisconsin. In granting summary judgment for the seller, the District Court erred in two principal ways. First, the Court erred in concluding that no claim had been asserted against the railroads within the relevant time frame. By 1995, well within the 10-year time period, the principal polluter, NSP, knew that it faced massive liability. It concluded that the railroad shared in that liability. It had legal rights it could assert against the railroads, and it had met with the railroads armed with lawyers, evidence, and studies to discuss what it described as the railroad's, quote, potential responsibility for environmental issues at Crayer Park, close quote. Representatives from both railroads understood that a claim had been asserted, and the railroads chose to coordinate a joint response to the claim. On these facts, under Minnesota law, a claim was asserted. Second, the District Court erred when it saddled WCL with all of the seller's damages, even though WCL purchased only half of the seller's historical assets. Indeed, the District had gifted away to another recipient five years before WCL was even on the scene. Mr. Gershengorn, on that second point that you made with regard to the language or the operation of LST, and I'll be posing a similar question to Ms. Coberly, what should the Court's limiting principle be to that language? How far does that go? So, Your Honor, what the Court, what Courts have said over and again is that it can't be to the limits of the sort of, of the terms indeterminacy. And so I think it's sort of like a proximate cause kind of analysis. Your Honor has to look at the closeness of the connection. Here, I think that the commercial dock, for example, is not related to the assets we brought in at least four ways. It's distinct. First, it's distinct physically, right? The commercial dock was gifted away and we didn't purchase it. It's distinct operationally. The railroad was able to operate its, and do its operations long after the commercial dock had been given away. It's distinct chronologically, right? The dredging that we're talking about here, the environmental claims happened at the turn of the last century, in the early 1900s. And we bought the modern operations of, of, of Soo Line. And so it's distinct chronologically and it's distinct legally. Your Honors can see that at the supplemental appendix, page 156, where the United States explains the basis of Superfund liability and distinguishes between railroad operations on the one hand and the dredging at the commercial dock on the other hand. And so we think that any sort of reasonable understanding of the term relating to would not make WCL on the hook for all of damages, for example, for all environmental damages caused, for example, by the dredging at the commercial dock in the early 1900s. What about the other two aspects of the settlement that are encompassed within the damages? The hazardous substances spilled as a result of activities at or around the Creer Park and the treating of the railroad ties at the site. Do you agree that if you're responsible for all of the damages, and we reject your, your footprint argument, do you agree that those two categories of damages are related to the operation of LST? So your Honor, I, I, we don't to the extent those are at the commercial dock itself. There was a rail track on the commercial dock, but we didn't purchase that. And so, you know, I think there would be some wiggle room there. But isn't that separate? You're talking about the commercial dock. Doesn't the commercial dock go with the dredging category, not the Creer Park category? I'm asking about the other two categories. So we're not, we're not contending. I think what I would say, your Honor, is the commercial dock is emblematic of the district court's error in the sense that the district court gave us all of the damages. The only evidence that had been put in to allocate was actually our evidence that it was 54 percent, 54 percent our fault and, and the rest Soo Line. There was nothing else before the district court. So actually on the record before this court, I think it actually is sort of an all or nothing choice. If the court disagreed with that, I think the district court would have some flexibility to decide what's properly allocated to us and what's properly allocated to Soo Line. But the evidence in the record... Do you agree, again, let me, let me ask it a different way. Sorry to interrupt. No, I'm sorry. If we reject your footprint argument. Yes. You've just made an argument with respect to the commercial dock and it being physically, operationally, chronologically, legally different. And the way I read the record, I connect the commercial dock with the dredging operations because that was part of it. There are two other categories according to the settlement letter that the settlement was for. First one, the hazardous substances at Creole Park and the third one, the treating of the railroad ties at the site. That's correct, Your Honor. 5.25 million covered all three of those categories. My question to you, please. The 10 million, Your Honor, covered all of those categories. I'm taking your portion of it. Yes, the 10 million in total, but your portion of it. Do you agree that the first and the third category, so the hazardous substance at Creole Park and the treating of the railroad ties are related to the operations of the LST line? Yes, Your Honor. But again, so the answer is yes, Your Honor. But I do think that, but if I could just... And I understand you're saying there's nothing in the record to make a proportionment of that. I'll use the full settlement amount. There's nothing to say what portion of the 10 million went to each of those categories, but your contestant category two, I did not read you as contesting categories what I'm calling one and three. Correct, Your Honor. And I just make one final point on that, which is to say we treat the commercial dock as emblematic of our point here and really the best evidence. Our broader point is that no allocation was made between indemnifiable claims and not indemnifiable claims. But if I could pivot for a second. I'm sorry, let me just follow up on that one second and I'll let you get back on track. No allocation was made. Was there no allocation made in connection with settlement or no allocation made by the district court or both? The latter, the latter, Your Honor. Was there an allocation in the settlement that's anywhere in the record? Not that I'm aware of, Your Honor. All right, thank you. Okay, but and I would say Your Honors have started with the damages question, which of course we feel very strongly about, but I'd like to pivot if I could to the liability question and the question about assertion of a claim. And if I could focus the court's attention on the May 2nd meeting with at the offices of Michael Best and sort of three basic points. I want to focus the court on what happened before the meeting, what happened at the meeting, and how people perceived the meeting. Remember before the meeting, NSP had quote made a determination that the railroads were potentially responsible parties with respect to contamination at Crayer Park. That's at the names of potentially responsible party by Wisconsin, which meant according to the letter, they had quote a statutory responsibility to restore the environment and minimize the harmful effects of the release of waste. And third, when they asked for the meeting, the testimony, their own testimony was the purpose of the meeting was to discuss quote Wisconsin Central's potential responsibility for environmental issues. That's at supplemental appendix 49. Then of course, in prep for the meeting, right, they came armed with lawyers, evidence, and studies. Before the meeting, they sent a dames and more report that quote confirmed the regular dumping of some kind of waste by the railroad cars. That's at SA 75. And at the meeting, their lawyers handed over a status report that said that NSP had quote found close quote through its investigation that quote the railroad may have contributed to the site. After the meeting, and of course they handed over an index, a five page index of documents in advance of the meeting, which is also in the supplemental appendix. After the meeting, the testimony from Janet Gilbert, which is at SA 130 and following her declaration was that she understood a claim had been asserted, that she told Sue Line about the meeting, that Sue Line understood a claim had been asserted, and the railroads jointly agreed to coordinate their defense to the claim. We think in that situation, a claim has clearly been asserted under the contract. Now the district court viewed all that as just what she described as quote an invitation to voluntarily contribute. With respect, we don't think that's a fair characterization. Sophisticated corporations represented by lawyers showing up at meetings, handing out reports, are not making mere invitations to voluntarily contribute. What about the fact that this arises from Wisconsin's investigation and Wisconsin's identifying of NSP? Under the law, given that investigation, NSP doesn't have a right to bring in a third party for indemnification, so they could not have made a claim to bring in Sue Line or WCL at that point. So how does that impact the claim analysis? So we disagree with that fundamentally, your honor, that NSP had a negligence claim. Indeed, they brought a negligence claim against the railroads and a public nuisance claim under Wisconsin law, and those claims survived a motion to dismiss. But your dispute, it would be a separate negligence claim. It couldn't be a third party contribution claim to Wisconsin's investigation, Wisconsin's claim against NSP. Right, your honor. What we think is they had a negligence claim against the railroads for money to be paid that they were having going to have to pay out to Wisconsin. And that, remember, that claim actually was brought and it survived a motion to dismiss. Now the fact that they didn't mention that claim or raise the claim doesn't change it. The case law is very clear, you don't have to cite legal authorities. But remember what the purpose of this clause is, right? The purpose of the clause is that once you get a claim asserted against you, you give notice to Sue Line, right? And the idea is that Sue Line should be aware of potential indemnification problems it has at a time when it can do something about it. So imagine this had happened at year one instead of year eight of the 10-year period. If WCL had had this meeting with NSP and then had sat on it and twiddled its thumbs, meanwhile, Wisconsin had gone ahead and NSP had developed the record and negotiations had been made. And then six years in, we had turned to Sue Line and say, oh yeah, by the way, there's this claim. They would have said, what are you talking about? How could you not tell us about this? Of course we want to get involved. And how do you know that? Well, the buyer shall give timely notice to permit Sue the necessary time to evaluate the merits of the demand so that its interests are not materially prejudiced. And on that point, Mr. Gershengorn, I'm reading from page 24 of Ms. Korbely's brief. Sue Line makes the argument, words are known from their associates. Claim is a similar vein to demand, action, suit, and proceeding. It strikes me that the description of the claim that you're for purposes of indemnification. If we're looking at those other words, action, suit, and proceeding, those would have a strength that perhaps doesn't bear the weight here of what was done. What do you think? I think that's exactly right, Your Honor. There are contracts, of course, that require a suit, a legal proceeding. This doesn't. It requires a claim. And actually elsewhere in the contract, to reinforce Your Honor's point, at section 4E, at SA 36, the contract defines three-year claims, which require, for example, that it be booked as a liability or something, a degree of formality that, of course, a regular claim doesn't. And indeed, under Minnesota law, the SCSC case makes clear that sometimes even just a request for information can be a suit. We, of course, are talking about a claim. So what does a claim mean? Your Honor is exactly right. It takes its meaning from the terms around it. But also, the Rotrama case from the Eighth Circuit, I think, is extremely instructive. It's interpreting Minnesota law. And of course, the Eighth Circuit has expertise there. And what Rotrama says is it's the assertion of an existing right. It's an assertion by a third party, quote, that the recipient may be liable to it for damages. And what it distinguishes, and this goes, I think, exactly to Your Honor's point, what it distinguishes is the mere request for information or the mere statement of facts already occurring. So that's not a claim, right? On the other hand, what it distinguishes is it rejects the idea that it has to be, quote, a written legal demand for monetary relief within which is an express or implicit threat to sue. That really is getting close to the other terms Your Honor mentioned, action, suit, those kinds of things. And so we do think that that claim has a much reduced degree of formality. And I think, again, what the other side, what Suleyn's position is, is it has to be an assertion of a legal right one is not free to ignore. That's not what a claim is. And the purpose, you know, the combination of the other terms around and the notice provision, the purpose of the notice provision, I think, all reinforce that. Mr. Gershengorn, I want to go back to where you were mentioning a moment ago, the meeting with Michael Best. How could Michael Best have your client if it thought that NSP had a claim to assert against your client? Well, Your Honor, I mean, there's a somewhat glib, facetious answer, which is you can represent to the extent the client waives and the client waived. But I understand, and so that's the short answer. But to go to Your Honor's question directly, it's that SA-122 and 123 is sort of the waiver that eventually comes out. And the waiver says, the waiver is premised on the idea that there is adversity, right? And what the waiver says is that Michael Best can't represent NSP in, quote, related cost recovery or contribution litigation against WCL. Again, this goes back to Judge Brennan's point. It doesn't say you can't represent them if you're going to assert a claim or if you're going to assert a legal right. It says you can't represent them in contribution or cost recovery litigation. That's if they had filed suit. Of course, the meaning of that letter, we think it's actually clear and helps us, but the District Court thought otherwise. At the very least, that's not something the District Court could have granted summary judgment on us against. The question of exactly what Janet Gilbert was thinking and what WCL was thinking at the time that the waiver was granted is, of course, not something that could be resolved on summary judgment. But we don't think that that waiver letter is enough to undercut the formality of that meeting. And, again, I think in the real world, just pivoting back, if I might, to Judge St. Eve, back to the facts of that meeting, you know, in the real world, you don't hire your lawyers to come in and just say, oh, here's a request for information or here's facts or please contribute voluntarily, right? An invitation to voluntarily contribute is what I say to a friend if I want to borrow some of their lunch, right? It's not what one company says to another when that company has already been named a PRP. Now, remember, that happened and is, I think, really the triggering point for the May meeting. But also in the real world, you're not going to bring in lawyers who you think to represent you against a client who you think might be adverse to you. So, Your Honor, I guess I would say two things. I think, actually, there are a host—I think it's not in the record, so I'm not testifying, but I certainly have seen a range of approaches to conflicts. But I also think in the environmental context, Your Honor, Michael Best suggested that they actually could represent both. There's no doubt—let me put it this way—there's no doubt that money that my client would have put in or that Zuline would have put in would have reduced NSP's liability. And so I think looking at the waiver letter, it is really the tail wagging the dog in a way that I don't think is appropriate, period, but certainly not appropriate on summary judgment. I mean, if there's—the fact finder wants to take testimony as to what my client meant as to the waiver and what the significance of it is fine, but I don't think any of that can overcome the fact that there's a degree of formality in the tone, in the approach, in what NSP thought going in, which was that the how it was perceived by both WCL and Zuline and how they worked together. Mr. Gershengorn, you're into your rebuttal time. Do you want to reserve the remainder? I would reserve the remainder. Thank you, Your Honor. Thank you. Ms. Corberley on behalf of Zuline. Thank you very much. Good morning, and may it please the Court. The outcome in this case is exactly the outcome that the parties bargained for. Environmental problems can take years and years, even decades or a century to come to light, and it can be many more years before a claim is asserted. And, of course, environmental claims often have nothing to do with faults. They're strict liability based on ownership. That's why the parties here agreed to a bright-line cutoff for liability. It was the idea of WCL's lenders, actually, to give them certainty during the early period of their loans. So what they insisted on was that Sue would agree to be liable for claims asserted before October 1997, which is roughly the period of the loans, and WCL would be liable for claims asserted after. It's very clear. It's much clearer, for example, than if liability depended on when the problem arose or whose fault it was or who owned more land over what period. Where in the record is it clear that the loans were, in fact, the motivation? In black and white, where does it say that in the record? It is undisputed, and WCL concedes in its brief that this change was motivated by WCL's lenders. That has never been in dispute. Have no correspondence, nothing from the negotiations, anything like that in the record? I don't believe so, Your Honor, because it was never in dispute. Everyone always knew that it was WCL's lenders who had asked for that provision, and WCL actually concedes that in its appeal brief. When we're talking about the language of this liability provision, the district court held that the liability here belongs to WCL because no claims were asserted against the railroad until 2011, 14 years after the cutoff. If you look at that period before the period up through October 1997, no one filed suit against a railroad. No one took administrative action against the railroads. No government agency named WCL as a potentially responsible party. No one sent a letter to a railroad saying, I've been damaged, you should pay for it. No one said, even at the meeting that Mr. Gershenborn was talking about, no one said, I've incurred expenses, and you should pay for it. That's what asserting a claim would look like, and that didn't happen here. Currently, the Wisconsin authorities thought that the railroads were a comparatively minor contributor to this problem. Am I right? During the claims period, the Wisconsin State Agency said nothing whatsoever about any responsibility of the railroads. It was only after the end of the claims period that the Wisconsin State Agency issued a potentially responsible party letter with respect to solid waste, in other words, debris that was discarded on the right-of-way. But in subsequent correspondence, the Wisconsin State Agency made clear that there was no liability associated with that. It was simply debris in the railway, in the right-of-way. It was not a hazardous substance. So the state agency never said that any railroad was responsible in any way for hazardous substances, and that's what this case is about. It's about hazardous substances. We all agree that that solid waste is not at issue in this case, and in any event, again, that didn't happen until after the claims period closed. My colleague referred to the Ritrama case and put a lot of emphasis on it, and I just wanted to speak about that case and about the cases generally. All of the authorities cited by WCL involved some sort of request that there was some legal force behind. And we know both from the law and from the power company's own concessions that the power company had no right under Wisconsin law to force the railroads to come to the negotiating table. What it was trying to do actually was to get the state agency to force the railroad to the negotiating table, and of course, that effort failed. Every single one of the supposed claims that were asserted by the power company, and when you ask them what they are, what they point to is a newspaper article in which someone from the company said that liability for the cleanup could include the railroad. This investigator's report and the content of the meeting at the Michael Best office that we've discussed was about potential liability as a potentially responsible party. Of course, the power company does not have the power to declare the railroads to be a potentially responsible party. The only one who can do that is a government agency. And what the power company didn't do was assert any claim for its own damage. Mr. Gershengorn referred to here today and also in the briefs to a claim for negligence, a civil negligence claim. As was discussed earlier, the only damages that WCL claims in negligence ever, even when it ultimately asserted that claim 15 years later, was the costs that it had incurred in repairing the cleanup. Well, that's not a negligence claim. That's a contribution claim. And Wisconsin law is clear that a common law negligence claim lies only when the party can claim damage to property it owns, not to property someone else owns. Otherwise, that would be a contribution claim. It is true that that claim ultimately survived a motion to dismiss, but that was 15 years later. The claim was the tail wagging the dog. And there was an argument made in a motion to dismiss that all of those claims were preempted. The court ruled that that ground for a motion to dismiss was premature and it denied the motion. But this issue that I'm raising today about whether a negligence claim even lies when you don't have damage against your own self was never briefed or decided by any court. Ms. Copeland, I'd like to shift to the damages portion for a moment, please. The district court ruled that it is undisputed that the Superfund claims arose from the operation of the LST, but she didn't cite anything supporting that statement. What in the record supports that conclusion that it's undisputed that the settlement claims arose from the operation of the railroad, the LST line? So, if I may, could I take one step back from your question and then I promise... As long as you answer the question. However you want to answer it is fine, as long as you answer, please. Very good. Thank you. First of all, I just want to clarify that the lawsuit that the claim that was being asserted by the EPA, which was never a lawsuit, it was a PRP determination, but the claim that was being asserted by the EPA did not rest on any specific act or contribution to the contamination. That's not what EPA and CERCLA liability rests on. CERCLA liability is strict liability for owners, and there is no dispute in this case that the to assert that both of the railroads were potentially responsible parties wasn't what they did or what caused the contamination. It was the fact that they owned the right of way, and that was clearly an asset that was acquired in this transaction. So, that's the basis for the EPA liability, and that covered the entire settlement. The language now turning to your question... The contract language. Right. So, I'm trying to link... That was the foundational statement for the damages determination by the district court. So, I'm trying to link that back to the contract language here that it has to be related to the operation of the LST. So, the work is being done in that sentence related to the operations of LST. The work is being done by operations of LST not relating to... What this contract did was it actually didn't use the language to describe the modern day operations of Soo Line in this district, which is... It was called the Lake State Transportation Division. That language is missing entirely from this purchase agreement. What the purchase agreement referred to was operation of LST, and then it defined LST in an exhibit to include the Ashland dispenser line. That's the only rail line that went through Crayer Park. It's the only rail line in town, and everything that the railroads did in connection with Crayer Park and in that region had to do with the operation of that line. That's the business they were in. They were in the railroad business. So, what in the record supports that the dredging of the bay, which was part of the settlement, was related to the operation of the LST rail line? Well, I will tell you there isn't language, and the reason there isn't language is because this issue was never supposed to be litigated. There isn't a reference in the record, I'm sorry, because this issue was never supposed to be litigated. What do you mean by that? Well, as part of summary judgment, it was certainly put before the court. It was. It was, and I want to be clear what I mean about that. The parties agreed that if one side or the other won summary judgment, the only thing that would be left is damages, and they allowed 60 days for that discovery, and they and what were your attorney's fees. What WCL did at that point was inject this new idea, which is that the damages should somehow be allocated based on what did or didn't happen in 1880, and that was never part of this contract, and to the contrary, this is exactly why the allocation. There's no basis for reducing that liability based on who caused the contamination, and that's what WCL is trying to do here. It's trying to point the finger and say, but you're responsible, and I heard Mr. Gershengorn say it this morning. He said it's 52 percent our fault. Well, fault plays no role in this. To the contrary, the whole point of this indemnification provision is to say that WCL should pay not only for whatever it caused, but also for what Soo Line and its predecessors caused in connections with assets acquired. There is limiting language, and putting aside the footprint argument, the percentage argument, burdened approved damages is on Soo Line. There is contractual language that defines what kind of damages you're entitled to. Environmental matters relating to the ownership of the assets or the operation of the LST, and this $10 million settlement covered three particular areas that I think you heard me before. And that's where I disagree. So what do you disagree with? Because that seemed to be the basis of what the district court did. Right. Well, there are two different ways to get there, and the district court talked about one of them, and I agree with that, of course, and we briefed it at length in our brief. There's another way to get to the same result, which is through assets acquired. When there's actually a claim filed, you look at what the ownership. That's what the EPA alleged as a basis for a potentially responsible party. That's what NSP alleged in its lawsuit, and that's why I directed the court to supplemental appendix 155, where EPA says this is a joint and several liability site, and the railroads are responsible parties. Therefore, from the United States perspective, it is not necessary to allocate liability among the parties based on what each party did or may have contributed at the site over more than 100 years of operations. But even, I understand that language is there, but under the contract and what you've agreed to with WCL, it seems that it's Sioux Line's responsibility to identify how these damages would fall within the operation of the LST. And back to my question, I'm trying to figure out how, in particular, the dredging of the bay, which was one of the categories of settlement, how that is related to the operations of the LST line, or it could also fall within related to the ownership of the assets, but I think that's a question. So, the operation of the LST, looking through the record and looking through the district court's holding, what evidence was admitted that proves that the dredging expenses from whatever time they took place are related to the operation of the LST line? So, I'm going to answer that question, and then I'm going to move to why I think it's not the right focus. So, the answer to the question is the historical expert reports that are before the court in the record refer to a couple of, there were a number of different kinds of dredging that occurred over 100 years. Some of the dredging over the years was done by the Army Corps of Engineers in the early 20th century. Some dredging was done in association with just creating the commercial dock, but the dredging that, whatever dredging was done by Sioux line for the commercial dock that it built was necessarily part of its railroad operations. Sioux line and its predecessors were never dredging companies. They were never boating companies. They were railroad companies, and they built a commercial dock to advance the rail line that went through Crayer Park, which is the Ashland dispenser line, the only railroad in contractual definition of LST. Were there any other rail lines going through there? No. No other rail lines going through there. That is the only rail line. So, by definition, whatever Sioux line and its predecessor railroads did in that vicinity was in service of its rail business. There's never been any suggestion that Sioux line started a new business doing something else. The only thing Sioux line was doing in Crayer Park ever was operating the Ashland dispenser line. And that's how we get to that point. On this issue of the limiting, I think you've answered it well with regard to Judge St. Eve as to how far that language goes, but help the panel as we look at that particular language. It strikes me there's three areas that could be potentially in dispute related to operation of an LST. LST of those three possibilities is the most objective or well-delineated, and certainly we're familiar from the supplemental appendix with page 29, which defines the Ashland dispenser railroad line, and essay 6, which talks about all interests of LST. So the contract gives us some grounding with regard to what that means, but that, how elastic that provision is going to be is going to, I think, affect the panel's analysis with regard to whether there should be a remand or not. What is your argument with regard to what that phrase, how that phrase should be interpreted for purposes of our work? So I think that phrase, the phrase operation of LST, has to be understood in the context of that whole, of the whole provision, of course. And the other, the thing that immediately precedes operation of LST is it says all claims for environmental matters relating to the ownership of the assets or the operation of LST. So what that or tells us is that the operation of LST is in there to take the liability beyond the specific assets acquired. Now, as I've explained before, I think we get to 100% of this indemnification just by looking at assets acquired because the right of way was the sole basis for determining, for the EPA's determination that the railroad was a potentially responsible party. That was actually the sole basis, was the ownership of the right of way, which WCL acquired. But what we know, what we can tell about the operation of LST is it was intended to go beyond the ownership of the assets. There's no question that this, we're talking about environmental liability that extends back more than 100 years. But that's the way environmental liability works. You're liable, you are strictly liable based on your ownership of property for whatever happened there a century before. That's just the way environmental liability works. So although that does seem long and it seems attenuated, that's a function of the scope of our, of CERCLA, which creates that extensive liability. That's not a function of this agreement, which included not only ownership of the assets, including the right of way, but also operation of LST. And the only thing that could be doing in that sentence is extending the liability to the historical operation of LST. And the historical operation of LST included whatever the railroads were doing in Crayer Park because the only thing they were ever doing in Crayer Park is operating the Ashland dispenser line, including their work, whatever it was associated with the commercial park. Thank you. Let me recognize Judge Ripple. Is there any further questions that you might have of Ms. Colberly? No, thank you, Judge Brennan. I'm quite satisfied. Judge St. Eve, any further questions? Very good. Mr. Gershengorn, let me go back to you for rebuttal. Thank you, Your Honor. I have a couple of quick points on the damages. On claim, I want to just address Judge Ripple's question about whether the state agency thought they were a minor player. The key point for us is that the claim is being asserted not by the state agency, but by NSP. And there is no doubt that NSP thought that the railroads were potentially responsible parties with respect to the contamination. Now, Ms. Colberly said that there was no claim because there was no present harm. But of course, NSP had suffered present harm. It had already, for example, expended money to do six borings. That's on page SA42. There was present harm. There was certain harm flowing from the PRP. NSP had a present legal right. The fact that they didn't put it in a letter, another point Ms. Colberly made, our case is stronger than that, right? They didn't put it in a letter because they had a meeting with their lawyers where they said, we have found that you are potentially responsible at the site. So we think a claim was asserted. When we shift to damages, a couple of quick points. We don't dispute, of course, that environmental liability can shift back a century, but this is not a case asking which side has environmental liability. It's which side has contractual liability. And it is not a reasonable reading of the contract to say that relating to, which Ms. Colberly had no limiting principle at all, said everything relates to. It's not a reasonable reading of the contract to say that it relates to our purchase to damages that were done by property that was sold off five years before we even came on the scene. This case should be at the very least remanded for the district court to do the allocation, relying on the evidence we put in and that at Soo Line chose not to put it. Thank you, Your Honors. Thank you, Mr. Gershengorn. Thank you, Ms. Colberly. I know I speak for the panel that we wish all of, and please pass this on to your teams as well, we wish all of our briefing was this good. Thank you very much. Thank you, Your Honor. Case will be taken under advisement.